Date signed September 26, 2012



THOMAS J. CATLIOTA
U. S. BANKRUPTCY JUDGE

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF MARYLAND
### at GREENBELT

| | |
|---|---|
| In Re: | |
| Harvey J. Korman and Susan C. Korman | Case No.    09-13311-TJC |
| Debtors | Chapter    7 |
| In Re: | |
| Jonathan S. Korman and Michelle E. Korman | Case No.    09-13353-WIL |
| Debtors | Chapter    7 |
| EagleBank | |
| Plaintiff | |
| vs. | Adversary No.    09-786 |
| Harvey J. Korman | *Lead Adversary Proceeding* |
| Defendant | |
| EagleBank | |
| Plaintiff | |
| vs. | Adversary No.    09-362 |
| | *Jointly Administered* |
| Jonathan S. Korman | *Adversary Proceeding* |
| Defendant | |

## MEMORANDUM OF DECISION

EagleBank brings this action seeking a determination of the dischargeability of debts owed to it by Harvey J. Korman and Jonathan S. Korman, father and son, and objecting to the discharge of Jonathan Korman.  Following a trial, the Court dismissed a dischargeability claim against Harvey Korman.  For the reasons that follow, the Court excepts from discharge Jonathan's debt to the Bank under 11 U.S.C. §523(a)(2)(B); excepts from discharge a $23,102 debt resulting from the diversion of collateral by Jonathan and Harvey to the Bank under 11 U.S.C. §523(a)(6); and denies Jonathan a discharge under 11 U.S.C. §§727(a)(2),(3) and (7).[1]

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§1334, 157(a), and Local Rule 402 of the United States District Court for the District of Maryland.  This is a core proceeding pursuant to 28 U.S.C. §§157(b)(2)(I) and (J).  The following constitutes the Court's findings of fact and conclusions of law.

## FINDINGS OF FACT[2]

### A.  Imatek and the Bank Loan

Jonathan ("Jonathan") and Harvey ("Harvey") Korman co-owned Imatek of Maryland, Inc. ("Imatek"),[3] a compact disc and digital video disc replication and distribution company servicing corporate and government customers.  Jonathan served as the President and Harvey served as the Chief Executive Officer.  At all times, Harvey owned 51% and Jonathan owned 49% of Imatek stock.

Both Jonathan and Harvey (collectively, the "Kormans") filed for relief under Chapter 11 of the Bankruptcy Code on February 27, 2009,[4] which is the same day that Imatek closed for business.  On March 20, 2009, EagleBank ("EagleBank" or the "Bank") along with two other

---

[1] Unless otherwise noted, all statutory references herein are to the U.S. Bankruptcy Code, 11 U.S.C. §101, *et seq.*, as currently in effect.
[2] The parties submitted joint stipulations of fact from which many findings are made.  Docket No. 85.
[3] Imatek is an insider of the Kormans under §101(31)(a)(iv).
[4] The Court converted the Kormans' cases to Chapter 7 on October 26, 2009.

creditors filed an involuntary petition for relief against Imatek under Chapter 7.[5]  The bankruptcy court entered an order granting relief against Imatek on July 22, 2009.[6]

EagleBank is a Maryland banking institution that holds claims against the Kormans and Imatek.  The claims derive from loans to Imatek, which the Kormans guaranteed.  The loans are comprised of a series of promissory notes, security agreements, personal guarantees, indemnity deeds of trust, financing statements and other documents.[7]  The Bank filed a proof of claim in the amount of $2,925,941.39 in each of the Kormans' bankruptcy cases and a proof of claim in Imatek's bankruptcy case in the amount of $3,111,372.58.

The loans included a $750,000 revolving line of credit ("Revolving Loan") secured by Imatek's accounts receivable ("A/R").  The Revolving Loan could be borrowed against using a formula based on the outstanding A/R.  To obtain an advance, Imatek was required to submit a Borrowing Base Certificate ("BBC" or "BBCs") with supporting documentation.  Advances were available subject to the maximum amount available on the note ($750,000) and Eligible Accounts Receivable ("Eligible A/R"), defined as eighty (80%) percent of any invoices on the A/R report that were aged less than 90 days.  Additionally, if any A/R had more than 50 percent of its balance over 90 days old, all invoices of that customer were ineligible to secure additional advances.

---

[5] Case No. 09-14753-WIL.

[6] Docket No. 34, Case No. 09-14753-WIL.

[7] The loan documents include a Forbearance and Modification Agreement dated December 3, 2008, executed by Jonathan, Harvey, Susan Korman, and Michelle Korman; and Indemnity Deed of Trust, executed by Imatek of Maryland, Inc. and granted by Jonathan and Michelle E. Korman (spouse), recorded in land records of Montgomery County, Maryland on January 1, 2009; Indemnity Deed of Trust Modification Agreement dated October 8, 2008 and executed by Harvey and Susan Korman (spouse) in the amount of Four Hundred Thousand Dollars ($400,000); an Unlimited Guaranty of Harvey dated December 3, 2008; an Unlimited Guaranty of Susan Korman dated December 3, 2008; a Debt Modification Agreement executed by Jonathan as President of Imatek dated May 8, 2008; a Promissory Note dated October 7, 2005 in the original principal amount of $450,000, increased to $750,000 by a Debt Modification Agreement and amended Note;  a Promissory Note dated October 7, 2005 in the principal amount of $1,490,000; a Promissory Note dated March 3, 2006 in the principal amount of $799,255.49; and a Promissory Note dated May 8, 2008 in the principal amount of $400,000.

3

Imatek also was required to submit a BBC at the end of each month even if it was not requesting additional funds. The BBC consists of a one-page summary sheet of all A/R, Eligible A/R, borrowing ability, and the new loan balance, and includes an A/R report (the "A/R Report") that itemized each Imatek customer, invoice dates, invoice numbers, invoice amounts, and the age of each invoice.

Jonathan prepared and signed all BBCs. Harvey did not review the BBCs before they were submitted to the Bank, nor did he sign them. Every BBC contained the following certification:

> The Borrower further certifies and warrants that no default is existing at the date of this certification, and, to the best of the knowledge and belief of the Borrower executing this certificate, there has not been (except where noted below) any change since the computation date specified above which would materially reduce the amounts shown above is such amounts were computed as of the date of this certification."

*See, e.g.*, Ex. 25 at 1. In the BBCs, Jonathan also "reaffirms all warranties made in the [loan agreements]" and "certifies that [Imatek] holds . . . the . . . accounts receivable collateral [set forth on the BBC]." *Id.*

Jonathan understood that EagleBank was reasonably relying on the BBCs and the supporting documentation to make advances loan on the Revolving Loan. The BBCs constitute a writing respecting the financial condition of an insider of the Kormans, on which the Kormans knew the Bank would reasonably rely and did reasonably rely. The Bank deferred collection efforts against the Kormans and Imatek based on Jonathan's representations as to the accuracy of the BBCs.

Jonathan became ill after February 2007 with severe nerve issues and was physically incapacitated. Harvey worked full-time and took over daily operations of Imatek. Despite his condition, Jonathan continued to prepare and sign the BBCs. Jonathan returned to work and

managed the day to day operations of Imatek.  He made approximately 95% of the decisions, although he consulted with Harvey constantly.

Imatek began experiencing financial difficulties in 2007.  Harvey testified in his deposition that the company lost $1 million in 2008.  By September 2008, Imatek had a serious cash flow problem.

There are many material inaccuracies and errors in the A/R Reports submitted with the BBCs.  These include changing invoice dates, and constantly shifting A/R from the Eligible A/R to more than 90 days and back to Eligible A/R.  These inaccuracies and manipulations were intentionally made by Jonathan to hide the true A/R position of Imatek and they are addressed further in the Conclusions of Law.

### B.  Out-of-Margin due to Fictitious Training Receivables

Jonathan submitted an erroneous BBC on September 30, 2008 (the "September 30 BBC").[8]  The September 30 BBC listed total A/R of $1,036,132.16 and total Eligible A/R of $818,812.53.  Ex. 29 at 1.  Imatek's outstanding loan balance was $735,578.51, and so the September 30 BBC showed Imatek as being within-margin on the Revolving Loan, because the Eligible A/R exceeded the loan balance.  However, the A/R figures included substantial A/R that admittedly did not exist.  Jonathan testified that Imatek's accounting software system was being upgraded at that time.  To test the new software, several fictitious training invoices (the "Fictitious Training Receivables") were entered into the system.  He testified that he happened to print the September 30 BBC in the short window of several hours when the Fictitious Training Receivables were in the system.  Jonathan also testified that he signed and submitted it to the Bank without noticing the Fictitious Training Receivables.

---

[8] The September 30 BBC inadvertently states  "September 19, 2008" on the cover page, although it shows the correct date of September 30 at the signature line.  Ex. 29 at 1.  The A/R Report attached to it shows the correct date of September 30, 2008.  *Id.*

The Fictitious Training Receivables were identified at trial to include at least the following three receivables:

| Fictitious Training Receivable | Invoice Date | Invoice Amount |
|---|---|---|
| (1) CTAA Community Transps. Ass'n | 9/17/2008 | $195,000 |
| (2) TMPWOR/TMP Worldwide | 9/13/2008 | $165,435 |
| (3) Wealeain/Weaver Leather, Inc. | 9/27/2008 | $115,235 |

Jonathan learned about the Fictitious Training Receivables within four or five hours. EagleBank did not learn of the error until Bank representatives were meeting with Jonathan in mid-November 2008, and they discovered that Eligible A/R was so drastically reduced from the September 30 BBC. Jonathan provided no credible explanation for the delay in notifying EagleBank of either the inclusion of the Fictitious Training Receivables in the September 30 BBC or the fact that, once the Fictitious Training Receivables were removed from the BBC, Imatek was blatantly out-of-margin and in default.

After the Bank discovered the error, Jonathan prepared and submitted a revised corrected September 30 BBC on November 17, 2008 (the "Revised September 30 BBC"). Ex. 30A. On it, he listed total A/R of $414,646.26 and Eligible A/R of $322,447.01. *Id*. at 1. Thus, by Jonathan's own calculations, the September 30 BBC overstated total A/R by $621,485.90 ($1,036,132.16 minus $414,646.26) and Eligible A/R by $496,365.52 ($818,812.53 minus $322,447.01). *Compare* Ex. 29 at 1 *with* Ex. 30A at 1.

The Revised September 30 BBC showed that Imatek's outstanding loan balance was $735,578.51, secured by only $322,447.01 of Eligible A/R. The Revolving Loan was substantially "out-of-margin" because the loan balance exceeded the Eligible A/R. The parties stipulated that the Fictitious Training Receivables created an over-extension of credit by

$385,000.   The effect of the September 30 BBC, as described by the Bank, was that Imatek essentially gave itself an additional $385,000 loan without the Bank's consent.[9]

In attempting to explain why he included the Fictitious Training Receivables in the September 30 BBC, Jonathan testified that Imatek's A/R generally was about $1 million.  Since that was the approximate amount of the total A/R on the September 30 BBC, he says he did not notice the Fictitious Training Receivables.  The Court found Jonathan to be not credible and not credible on this point.  Imatek was a small corporation and serving as its President was Jonathan's livelihood.  Jonathan knew Imatek's approximate A/R position and the loan balance at all times.  He certainly knew that the Eligible A/R was less than half of what was necessary for the Revolving Loan to be in-margin.  The Court rejects any suggestion that, at the time he submitted the September 30 BBC, Jonathan himself believed that the A/R was twice what it actually was, notwithstanding whatever the BBC stated or however the Fictitious Training Receivables came to be included on it.  Stated otherwise, Jonathan knew Imatek was substantially out-of-margin when he signed and submitted the September 30 BBC, and whether or not he noticed the inclusion of the Fictitious Training Receivables in the September 30 BBC is beside the point.  These and other findings are addressed further in the Conclusions of Law.

## C.  Forbearance Agreement

Upon the Bank's discovery of the error, the parties engaged in substantial settlement discussions and entered into a Forbearance and Modification Agreement on December 3, 2008 (the "Forbearance Agreement").  The Forbearance Agreement modified all existing Imatek loans.  In it, the Kormans acknowledged that Imatek was in default of certain obligations to EagleBank, defined as "Existing Defaults" as follows:

---

[9] EagleBank did not actually lend new funds on account of the September 30 BBC.  It was submitted as a month-end BBC without a draw request.

      A.  Borrower failed to make payments when due.
      B.  The Revolving Loan was not affirmed for another year as required.
      C.  Borrower failed to meet its net worth covenant.
      D.  Borrower is out of margin in connection with the revolving loan.

Ex. 1 at 2.  The Bank reserved its rights and remedies with respect to any other possible events of

default under the loan documents.  *Id.*  The parties stipulated that the amount outstanding on the

loans was $2,709,921.99.  *Id.* at 3.  EagleBank agreed, among other things, to forbear from

exercising its rights, advance an additional $250,000 and modify the payment terms on the notes,

and required that all A/R payments must be sent directly to a lock-box account.  The Kormans

pledged additional collateral in the form of Indemnity Deeds of Trusts on their personal

residences and their spouses were added as guarantors.

**D.  February Defaults**

      On February 12, 2009, counsel for the Kormans wrote to EagleBank, stating that Imatek

was in a "serious financial crisis."  Ex. 76.  The attorney made it clear he represented the

Kormans, and not Imatek.  The letter requested a meeting to discuss an "orderly, structured and

hopefully collaborative method whereby the Bank's collateral pledged by the Borrower can be

preserved, maximized and hopefully enhanced in value by facilitating the continuing operations

of the Borrower's business."  *Id.*

      The Kormans' counsel sent a second letter dated February 20, 2009.  Ex. 76.  It stated

that Imatek was "out of money" and needed $300,000 of new funds within a week to stay open.

The letter stated that the Kormans were willing to surrender the collateral to the Bank if the

parties reached a global resolution, which required that some proceeds from the sale of collateral

be distributed to other creditors or to the Kormans themselves.  A fair reading of the February 20

letter is that Imatek would soon close its doors, and the Kormans were willing to work out an

arrangement in which the Bank could recover its collateral in an orderly fashion, but only if the Bank negotiated a resolution of the collateral satisfactory to the Kormans.

On February 25, 2009, EagleBank's counsel sent a notice of default to Imatek, which stated:

> We have been advised that you have failed to make your February, 2009 payments required . . . as modified in the Agreement. At this time, interest and late charges totaling $8,952.42, $3,332.41, $10,267.43 and $7,381.29 are due and owing . . . .
>
> In addition, this is to notify you that Imatek is also in violation of Paragraph 7 (n) of the Commercial Loan Agreement . . . inasmuch as the Bank has determined in good faith that a material adverse change has occurred in Imatek's financial condition and that the prospect for payment or performance of the Loan is impaired, to wit, we have received communications from you indicating that Imatek lacks the funding to continue its operations and that it will cease such operation in the near future, and that each of the Guarantors is currently contemplating filing a voluntary petition for relief under title 11 of the United States Code.

Ex. 54. EagleBank indicated that Imatek or the Kormans needed to deliver a certified check in the amount of $32,535.35 on or before March 2, 2009, and cure the defaults under Paragraph 7(n) of the loan agreement on or before March 18, 2009. EagleBank also informed the Kormans that pending a cure, the Bank elected to exercise its right of setoff and denied Imatek's request dated February 24, 2009, to access funds from the Revolving Loan. Imatek failed to cure the defaults, and on February 27, 2009, it ceased operations.

**E.  The PNC Account**

After Imatek closed, the Kormans opened a new bank account at PNC Bank ("PNC Account") in Imatek's name. They were angry at the Bank because it refused to advance additional funds.[10] They testified at trial that they had a good faith belief that EagleBank

---

[10] Harvey told Jonathan that he wanted to open the PNC Account because: "They fucked us. We're going to protect our money coming in." Stip. at ¶59.

breached the Forbearance Agreement, that the loan agreement with EagleBank was void, and they were entitled to take the actions to open the PNC Account.

Although the terms of the loan documents required all A/R to be sent to an EagleBank lock-box, Harvey wrote to the U.S. Government Printing Office ("U.S. GPO"), an A/R obligor, on March 2, 2009, instructing it to change Imatek's banking information, and stating "do not make any further payments to the previous banking information on record."  Ex. 39 at Bates No. 000492.  Jonathan emailed the U.S. GPO on March 9, 2009 requesting that it send the remaining balance on its invoice into the new PNC Bank Account:

> I am sorry to report that Imatek has been forced to permanently cease all operations.  We have been unable to reach agreement with our Bank to restructure our outstanding bank debt.  Unfortunately, this action was sudden and we are currently prevented from accessing any orders and material that were currently in production prior to our closing.  All of Imatek's possessions are now in the hands of our Bank and we are unable to further complete and ship any orders that were currently in product.
>
> However, prior to our closing, Imatek did complete and ship many GPO orders that have since been delivered and received in excellent condition by the GPO and related Federal Government agencies.  All of the orders invoiced and submitted for payment on and before March 1, 2009 have been shipped and delivered complete.  As such, Imatek expects to receive full payment for all such completed, delivered and accepted orders currently pending payment as provided for by law.  We have provided the GPO Accounting Office with all needed updated banking information to process these pending payments.

Ex. 39 at Bates No. 000425.

As a result of this email, U.S. GPO transferred invoice payments to the PNC Account in the amount of $23,102 (the "U.S. GPO Funds").  The U.S. GPO Funds would have been sent to the EagleBank lock-box in the absence of the Kormans' actions.  The Kormans never informed

EagleBank that its collateral was diverted into another account, nor did they disclose the PNC Account on Imatek's bankruptcy schedules.[11]  EagleBank never recovered the U.S. GPO Funds.

The Kormans were not able to offer a plausible, consistent explanation for what happened to the U.S. GPO Funds.  Jonathan's testimony on the disposition of the U.S. GPO Funds changed from his deposition to trial.  On March 12, 2009, Jonathan, with Harvey's consent, withdrew cash in the amount of $9,827.73 from PNC Account.  The Kormans never fully accounted for this cash.  Jonathan testified that the balance of the funds in the account after the cash withdrawal went to pay legal fees for three lawyers – the attorney who wrote the February 12 and February 20 letters; a criminal defense attorney to represent Jonathan on bad check charges related to Imatek payroll checks; and the attorney representing Jonathan and Harvey in this adversary proceeding.  Trial Tr., 130-131, May 4, 2011.  Although this legal representation was related to Imatek, each of the three lawyers represented one or both of the Kormans personally, and not Imatek.

During discovery, the Kormans failed to produce documentation and could not recall information that showed exactly how Imatek or Jonathan spent the U.S. GPO Funds.  However, in March 2011, the Kormans provided four documents to EagleBank that purported to reflect the use of the PNC Bank Account proceeds:

- An invoice dated June 14, 2009, from McClain's Van Lines in the amount of $2,500 for moving expenses of office furnishings and files from Imatek's offices in Gaithersburg, Maryland to Jonathan in Boca Raton, Florida.

- A memorandum dated December 15, 2010, from Barry H. Helfland, P.A. reflecting a payment of $1,250 on June 5, 2010.

---

[11] On July 22, 2009, the Court entered an order granting relief under chapter 7 on the involuntary petition filed against Imatek.  The Kormans were ordered to complete the schedules for Imatek and did not disclose the PNC Account.  They claim that the failure to disclose was an oversight, because at the time they filled out the schedules, the PNC Account had less than $1.00 balance.  In a signed affidavit, Jonathan fully disclosed the existence of the PNC Account on October 13, 2009, approximately eight months after Imatek ceased operations.

- An invoice from Swift Systems, Inc. dated March 31, 2009, reflecting a payment of $1,745 on April 2, 2009, for data recovery services purchased by Harvey and billed to Imatek; and

- An email dated December 22, 2010, from Danielle J. Chrisman, Firm Administrator to The Burns Law Firm, LLC reflecting receipt of $2,260 "for pre-bankruptcy consultations with you, your son, and Mr. Emil Hirsh regarding EagleBank and Non-Bankruptcy Workouts for Imatek."

The second and third of these items contradict Jonathan's testimony that the balance in the account after the cash withdrawal of $9,827.73 went to pay legal fees. The Bank subpoenaed the PNC Account records and the check amounts identified on the PNC bank statements matched the first two items above, but not the second two items. Ex. 42.

The Court finds that the Kormans were not able to adequately account for the U.S. GPO Funds, but that they used the majority of the funds to pay personal expenses.

## F. Post-default Collection of A/R

EagleBank attempted to collect the outstanding A/R by sending letters to the customers with open invoices and placing calls to the customers with larger balances. The Bank was not successful in recovering any meaningful amounts. It did not ask for Jonathan's assistance presumably because of the deterioration of the relationship by that time.

## PROCEDURAL HISTORY

On June 5, 2009, EagleBank filed Adv. Proc. 09-362 against Jonathan, and filed Adv. Proc. 09-786 against Harvey on November 12, 2009. The adversary proceedings were consolidated for purposes of trial. EagleBank brought §523(a)(2)(A) claims against Jonathan and Harvey; §523(a)(2)(B) claims against Jonathan; §§523(a)(4) and (a)(6) claims against Jonathan and Harvey; and §727 claims against Jonathan. The trial was held from May 3-6, 2011. In a bench ruling on May 9, 2011, the Court dismissed the §523(a)(2)(A) claims against Harvey. Docket No. 100 (Order Dismissing Count I Against Harvey Korman); *see also* Docket No. 104

(Bench Ruling Tr., May 9, 2012).  The parties submitted post-trial proposed findings of fact and

conclusions of law, and closing argument was held on October 6, 2011.  This memorandum

follows.

## CONCLUSIONS OF LAW

### A.  EagleBank's §523(a)(2) Claims Against Jonathan

"The Bankruptcy Code has long prohibited debtors from discharging liabilities incurred

on account of their fraud, embodying a basic policy animating the Code of affording relief only

to an 'honest but unfortunate debtor.'"  *Cohen v. de la Cruz*, 523 U.S. 213, 217, 118 S.Ct. 1212,

140 L.Ed.2d 341 (1998).  This policy, codified in §523, provides in pertinent part:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of
> this title does not discharge an individual debtor from any debt—
> * * *
> (2) for money, property, services, or an extension, renewal, or refinancing
> of credit, to the extent obtained by—
>
> (A) false pretenses, a false representation, or actual fraud, other than a
>   statement respecting the debtor's or an insider's financial condition;
> (B) use of a statement in writing –
>    (i)  that is materially false;
>    (ii) respecting the debtor's or an insider's financial condition;
>    (iii) on which the creditor to whom the debtor is liable for such money,
>      property, services, or credit reasonably relied; and
>    (iv) That the debtor caused to be made or published with intent to
>      deceive;

§§523(a)(2)(A),(B).  While exceptions to discharge are narrowly interpreted to protect the policy

of a fresh start, it is equally important that "perpetrators of fraud are not allowed to hide behind

the skirts of the Bankruptcy Code."  *Foley & Lardner v. Biondo (In re Biondo)*, 180 F.3d 126,

130 (4th Cir. 1999).  To prevail on a claim that a debt should be excepted from discharge, a

creditor must prove all the elements of §523(a)(2) by a preponderance of the evidence.  *Grogan*

*v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

EagleBank asserts Jonathan's debt should be excepted from discharge under both §§523(a)(2)(A) and (B).  The Court will address each in turn.

**1.  Jonathan's Liability under §523(a)(2)(A)**

EagleBank contends that Jonathan fraudulently induced EagleBank to enter the Forbearance Agreement by failing to disclose various defaults by Imatek under the loan documents.  EagleBank contends that Jonathan's failure to disclose the defaults was an omission that constituted a misrepresentation upon which the Bank relied.  EagleBank also asserts that Jonathan certified on the BBCs that Imatek was not in default on the line of credit and that it was in compliance with the loan document covenants, which was a certification incorporated by reference into all of the loan documents with cross-default provisions.  According to EagleBank, these certifications were false representations under §523(a)(2)(A).

The Bank's claims under §523(a)(2)(A) can be dealt with fairly summarily.  In order to establish liability under §523(a)(2)(A), a plaintiff must establish "(1) a fraudulent misrepresentation; (2) that induces another to act or refrain from acting; (3) causing harm to the plaintiff; and (4) the plaintiff's justifiable reliance on the misrepresentation."  *Miller v. Cigna Ins. Co.*, 311 B.R. 57, 61 (D.Md. 2004) (quoting *Biondo*, 180 F.3d at 134).

In a bench ruling after the trial, the Court dismissed the §523(a)(2)(A) claims against Harvey.  Because Harvey did not review or sign the BBC, the Bank did not assert claims against Harvey based on the BBCs.  The claim against Harvey under §523(a)(2)(A) was that Harvey (and Jonathan) failed to disclose that Imatek was insolvent at the time the Bank entered into the Forbearance Agreement.  For the reasons stated in the bench ruling following trial, the Court concluded that the Bank failed to establish this claim against Harvey.  The factual findings and legal conclusions that give rise to that determination are set forth in the bench ruling and are

incorporated here.  Docket No. 104.  These factual findings and legal conclusions apply equally

to Jonathan.  Therefore, the Court will dismiss the Bank's §523(a)(2)(A) claim against Jonathan

to the extent it is based on the allegation that he failed to disclose that Imatek was insolvent when

the Bank entered the Forbearance Agreement.

Unlike Harvey, of course, Jonathan was actively, indeed solely, responsible for the

BBCs and the statements made therein.  The parties have stipulated that the BBCs and attached

A/R aging reports are statements "respecting . . . and insider's financial condition."

§523(a)(2)(B)(ii).  That stipulation is consistent with this Court's bench ruling, as well as

established precedent in the Fourth Circuit Court of Appeals.  *See Engler v. Van Steinburg*, 744

F.2d 1060 (4th Cir. 1984) (citing *Blackwell v. Dabney*, 702 F.2d 490 (4th Cir. 1983) (statement

must be in writing to be excepted from discharge)).  Therefore, the Court will address the Bank's

claims against Jonathan based on the BBCs and the accompanying A/R Reports in the context of

§523(a)(2)(B).

### 2.  **Jonathan's Liability under §523(a)(2)(B)**

EagleBank contends that Jonathan's debt should be excepted from discharge because he

intentionally submitted materially false BBCs that induced the Bank to advance funds under the

loan, enter the Forbearance Agreement, and refrain from taking action against Imatek sooner.  It

contends the BBCs were materially false in at least three respects.  First, Jonathan falsified and

manipulated A/R information in multiple BBCs.  Second, Jonathan included the Fictitious

Training Receivables in the September 30 BBC.  Third, Jonathan misrepresented that Imatek was

not in default when he submitted a number of BBCs.  This Court agrees that Jonathan

intentionally falsified BBCs and A/R Reports in order to induce the Bank to advance funds under

the Revolving Loan, enter into the Forbearance Agreement and refrain from taking remedial action.  Jonathan's debt, therefore, is excepted from discharge under §523(a)(2)(B).

Section 523(a)(2)(B) bars discharge where the debtor obtains credit that was induced by a false written statement respecting the debtor's or an insider's financial condition.  Congress intended §523(a)(2)(B) to protect creditors who were tricked by debtors into loaning them money or giving them property, services, or creditor through fraudulent means.  *Field v. Mans*, 516 U.S. 59, 65-66, 116 S.Ct. 437, L.Ed.2d 351 (1995).  In order to satisfy §523(a)(2)(B), a creditor must prove the debtor: (1) used a statement in writing respecting the debtor's or an insider's financial condition; (2) that was materially false; (3) that the creditor reasonably relied upon; and (4) that the debtor made with intent to deceive.  *Guaranty Residential Lending, Inc. v. Koep (In re Koep)*, 334 B.R. 364, 372-373 (Bankr.D.Md. 2005) (citing *Ins. Co. of  N. Am. v. Cohn (In re Cohn)*, 54 F.3d 1108, 1114 (3d Cir. 1995)).

Here, the parties have stipulated to the existence of the first and third elements of §523(a)(2)(B).  Specifically, as noted above, they stipulate that the BBCs and the accompanying A/R Reports are statements in writing respecting an insider's financial condition.  *See* Stip. at ¶33.  They also stipulate that Jonathan knew that EagleBank was reasonably relying on the BBCs when he signed and submitted them to the Bank, and that the Bank did, in fact, reasonably rely on the BBCs.  Stip. at ¶¶32-33.  Their dispute is over whether the BBCs were materially false and whether Jonathan submitted them with intent to deceive.  The Court will address these issues, first in the context of the BBCs and the A/R Reports, and then in the context of the September 30 BBC and the Fictitious Training Receivables.

### a.  Materially False Statement and Intent to Deceive – The False BBCs

16

A materially false financial statement is a statement that paints a substantially untruthful picture of the debtor's financial condition with information that would normally affect a creditor's decision to lend.  *In re Koep*, 334 B.R. at 373.  "The concept of 'materiality' . . . includes objective and subjective components."  *In re McCleary*, 284 B.R. 876, 885 (Bankr. N.D.Iowa 2002) (citing *In re Dammen*, 167 B.R. 545, 551 (Bankr. D.N.D. 1994)).

Debtors rarely state that that they acted with intent to deceive.  Therefore, courts are permitted to infer that a debtor made a false statement with the intent to deceive from the totality of the circumstances, including a debtor's reckless disregard for the accuracy of the financial statements.  *In re Cohn,* 54 F.3d at 1118-1119.

EagleBank contends that Jonathan submitted numerous BBCs to the Bank that contained false A/R information.  The false statements fall into the following general categories: (1) changing customer names or other information without disclosing that it was the same customer with a different name or the same invoice with a different date; (2) using the purchase order date instead of the date of shipping and then switching to the shipping date as the order date became stale; and (3) including blanket purchase orders on multiple BBCs.

The A/R information in the A/R Reports was manipulated in order to present an inaccurate, overstated position of Imatek's A/R position.  The Bank's Ex. 70 listed some fifteen pages of questionable, inconsistent listings for the A/R.  The Bank's expert provided some cogent examples, although not by any means a complete listing, of these manipulations.  For example, an invoice from the U.S. Marine Corps first appeared on the A/R Report in September 2008.  By changing the invoice date or other information, that invoice remained on the A/R Report through February 24, 2009.  Thus, while Eligible A/R was limited to 90 days under the loan agreement, this invoice was included as Eligible A/R for 264 days.  The Bank's expert

identified invoices to Dering Corporation and Quantum Color/S2R as other examples in which invoices were included in Eligible A/R for 171 days and 232 days, respectively.[12]

The case of MJM Printing ("MJM") is illustrative. The owner of MJM testified that he received a demand letter dated October 13, 2008, demanding that he pay MJM's two outstanding invoices in the amounts of $4,320 and $1,072.25. The letter stated that payment was required in eight days or Imatek would take legal action. MJM's owner paid the invoices on October 31, 2008. He testified that the two invoices referenced in the demand letter were the only two invoices MJM had outstanding at the time, and his testimony is consistent with the demand letter.

The trail of the MJM invoices through the BBCs[13] is much different:

- The May 12 BBC lists the $4,320 invoice referenced in the demand letter as 31-60 days old with a date of March 28, 2008. Ex. 25 at Bates No. 000292.

- The August 6 BBC does not list the $4,320 receivable, although it lists for the first (and only) time a receivable from MJM that is 31-60 days old in the amount of $3,240 (suggesting that the $4,320 receivable was reentered with transposition errors). Ex. 27 at Bates No. 000314. The August 6 BBC lists the $1,072.25 receivable referenced in the demand letter receivable as a current receivable. *Id.*

- The September 19 BBC lists the $1,072.25 receivable as 31-60 days old, and the $4,320 receivable as current. Ex. 28 at Bates No. 000321. It also lists a $5,400 receivable that is over 90 days old (and therefore not included in Eligible A/R). *Id.*

---

[12] *See infra* n. 13 (explaining shifting of two invoices from the September 19 BBC to the September 30 BBC).
[13] Hereinafter, specific BBCs will be referenced by the date they were submitted to EagleBank in 2008.

18

- The September 30 BBC shows the $4,320 receivable as 31-60 days old, the $1,072.25 receivable as 61-90 days old, and now lists the $5,400 receivable as 61-90 days old (and therefore included in the Eligible A/R). Ex. 29 at Bates No. 000738.

- The October 31 BBC shows the $5,400 receivable as being more than 90 days old.  Ex. 30B at Bates No. 000771.

- The December 15 BBC and the December 18 BBC show the $5,400 receivable as 61-90 days old (and therefore included in Eligible A/R).  Ex. 32 at Bates No. 000790; Ex. 33 at Bates No. 000798.

Thus, on September 30, 2008, Jonathan was reporting to the Bank that the $4,320 receivable was only 31-60 days old and the $1,072.25 receivable was only 61-90 days old (although it was current on the August 6 BBC), and this was just thirteen days before he sent a final demand letter threatening legal action because the receivables were so badly past due. Further, a purported $5,400 receivable that was more than 90 days old in the September 19 BBC somehow became less than 90 days old and eligible to be included in the borrowing base three months later on the December 18 BBC.  And this does not even account for MJM's owner's credible testimony that the payment on October 31, 2008 cleared all outstanding accounts with Imatek.

Quantum Color is another example:

- The August 6 BBC lists a receivable in the amount of $83,031.47 with an invoice date of May 12, 2008.  Ex. 27 at Bates No. 000315.  It is listed as 61-90 days old.

- The September 19 BBC lists the same receivable with an invoice date of August 26, 2008, and so it is reported as current.  Ex. 28 at Bates No. 000322.

19

- The September 30 BBC lists a date of August 11, 2008, and it is reported as 31-60 days old.  Ex. 29 at Bates No. 000740.

- The October 31 BBC lists this receivable under the name "S2R" in the same amount as being 61-90 days old with an invoice date of August 11, 2008, and invoice number of 101575JK4.  Ex. 30B at Bates No. 000780. No other receivable is listed for S2R (or Quantum) on the October 31 BBC.  *Id.*

- The December 15 BBC lists a receivable for S2R with the same invoice number (101575JK4) in the amount of $76,210 with an invoice date of September 30, 2008, and it is shown as 61-90 days old.  Ex. 32 at Bates No. 000790.  The receivable is the same as that on the October 31 BBC by reference to the invoice number.  That fact is also established because Imatek could not have sold any product to Quantum/S2R after October 31, 2008 (the date of the October 31 BBC) that would have been between 61 and 90 days old on the December 15 BBC – only 45 days later.

- The December 26 BBC lists the receivable as being 61-90 days old.  Ex. 34 at Bates No. 000378.

Assuming this receivable was generated on May 12, 2008, as the August 6 BBC states, this receivable was reported as being under 90 days old (and eligible) from May 12, 2008, until at least the December 26 BBC.

Jonathan attempted to explain these and other inconsistencies and manipulations in the A/R Reports.  He was not credible and his explanations were not believable.[14]  The evidence established that he intentionally engaged in a pervasive manipulation of the A/R Reports.

One of his explanations was that he used the order date to list a receivable rather than the invoice or shipping date.  He testified he had always done this.  The Bank did not discover that Jonathan was using the order date until after it executed the Forbearance Agreement.  It objected and required Jonathan to change.  The Bank's expert testified credibly that it is customary in commercial lending in the Washington, D.C., metropolitan area that A/R is booked only when an invoice is sent to the customer.

Jonathan was not consistent in his use of the order date in that he did not use the order date and exclude it from Eligible A/R ninety days after the order.  He would initially use the order date and then change the age of the receivable when the invoice was sent.  This enabled him to include the same order on the A/R Report long past ninety days.

Jonathan's other explanations were equally unavailing.  In many cases, there was no rational explanation for the movement of receivables between the aging categories. His explanations consisted of unsupported statements concerning changed orders or the submission of blanket purchase orders.  His testimony was contradicted by two of Imatek's customers.  On the eve of his testimony, he produced several purported invoices that supported his testimony even though he has not been able to produce any other invoices for years despite the Bank's diligent discovery efforts, and still has not produced any Imatek invoices other than those few at

---

[14]  The Bank called Hugh Rial to testify on a number of issues.  Among them, the Court allowed Mr. Rial to offer his opinion on Jonathan's fraudulent intent.  Any findings and conclusion in this memorandum on Jonathan's intent to deceive or fraudulent actions is based on the documentary evidence and the testimony of Jonathan and the Bank's factual witnesses.

trial that helped his cause.  The Court concludes that Jonathan's manipulation of the A/R Report was intentional.

When the Bank entered into the Forbearance Agreement in December 2008, it knew that the Fictitious Training Receivables had been included in the September 30 BBC.  It did not know, however, that many of the A/R shown on the A/R Reports leading up to December 2008 had been manipulated to show a distorted and overstated A/R position.  The Bank did not make that discovery until it attempted to collect the A/R after Imatek closed.  The Court concludes that Jonathan intentionally falsified BBCs and A/R Reports in order to induce the Bank to advance funds under the Revolving Loan, enter into the Forbearance Agreement and refrain from taking remedial action.

The Court also concludes that the amount of the inaccuracies was material.  The manipulations so permeated the A/R Reports that the Court concludes the reports do not reflect an accurate view of Imatek's true A/R position.  This is established by the examples identified by the Bank's expert, the examples in Ex. 70 and the examples set forth above for MJM and Quantum Color.  It is also established by the fact that the Bank was unable to collect any meaningful amount of A/R after Imatek closed in February 2009.

A further indication of the materiality of the inaccuracies is shown by comparing the September 19 BBC (Ex. 28) with the September 30 BBC (Ex. 29).  While Jonathan attempted to explain how the September 30 BBC came to be overstated, he did not explain the massive decline in actual A/R in the eleven-day period between September 19, 2008 and September 30, 2008.  In the September 19 BBC, Jonathan certified that total A/R was $965,148.58, of which $743,690.46 was Eligible A/R.  After Jonathan deducted the Fictitious Training Receivables in the Revised September 30 BBC, the total A/R was $414,646.26 and the Eligible A/R was

$322,447.01 as of September 30. *See* Ex. 30A (the Revised September 30 BBC with the Fictitious Training Receivables deducted).

This means that, if the September 19 BBC was accurate, Imatek must have collected more than $500,000 of A/R between September 19 and September 30, 2008 (the A/R of $965,148.58 on the September 19 BBC minus the A/R of $414,646.26 on the Revised September 30 BBC).[15] By Imatek's standards at the time, $500,000 was a huge amount of cash, representing approximately one-half of the total A/R and two-thirds of the loan balance.[16]

Nothing in the record supports a finding that Imatek received such a substantial amount of cash during the 11-day period between September 19 and September 30, and Jonathan did not so testify. Jonathan admitted, "Imatek hadn't collected the amount of money showing on my AR report versus what Jan Williams [of EagleBank] was showing on her AR report [the September 30 BBC]." Trial Tr., 129, ll. 20-23, May 6, 2011. Although this statement appears to address Imatek's collections just after September 30, rather than the 11-day period before September 30, it is sufficient to support the inference that Imatek did not collect $500,000 just before September 30. And Imatek's financial condition remained strained during this period; Jonathan described it as a "serious cash flow problem." *Id.* at 130, l. 11. That would not have been the case if Imatek

---

[15] This estimate does not take into account any new A/R added after September 19, which would make the necessary collections as of September 30 that much greater. Moreover, theoretically at least, some of the Eligible A/R in the September 19 BBC could have aged past 90 days by the time of the September 30 BBC rather than being collected. This was not the case, however. In the September 19 BBC, $123,675.66 of Eligible A/R were listed as 61-90 days. No meaningful amount of those receivables was listed in the September 30 BBC as over 90 days. (Indeed, Jonathan simply shifted some of these receivables to being *more current* by September 30, 2008. One receivable from the U.S. Marine Corps in the amount of $23,313.00 was shifted from being between 61-90 days old in the September 19 BBC (Ex. 28 at Bates No. 000325) to being 31-60 days in the September 30 BBC (Ex. 29 at Bates No. 000743). A receivable from Comptroller FMCE in the amount of $27,748.20 was shifted from 61-90 days in the September 19 BBC to 31-60 days in the September 30 BBC. *Compare* Ex. 28 at Bates No. 000323 *with* Ex. 29 at Bates No. 000741.

[16] The September 19 BBC lists a $335,000 receivable (a huge receivable by Imatek's standards) from Comptroller FMCE, with a date of September 7, 2008. Ex. 28 at Bates No. 000323. This receivable does not appear on any previous BBC. It does not appear on the September 30 BBC, suggesting it was collected by then. Jonathan initially listed receivables by order date, not invoice date. For this receivable to be *bona fide*, it means the order was received by Imatek on September 7, 2008, and it was processed, completed, shipped, invoiced and fully paid in 23 days. This is highly improbable.

had collected $500,000.  Imatek continued to attempt to negotiate discounted settlements with its

creditors, and needed to ask for an additional $250,000 from the Bank to pay its bills.[17]  If

Imatek had collected such a large amount of cash it would have been able to repay a portion of

the Revolving Loan sufficient to keep it within-margin, or close to it, and pay its creditors.  The

Court concludes that the A/R Report attached to the September 19 BBC overstated A/R by

several hundred thousand dollars.[18]

Finally, §523(a)(2) requires that a debtor obtain "money, property, services, or an

extension, renewal, or refinancing of credit . . . ." through the misrepresentation. §523(a)(2).

Section §523(a)(2) does not except "simply any debt incurred as a result of fraud but only debts

in which the debtor used fraudulent means to obtain money, property, services, or credit."

*Nunnery v. Rountree (In re Rountree)*, 478 F.3d 215, 219 (4th Cir. 2007).  However, the terms

"extension, renewal, or refinancing of credit" in §523(a)(2) are "broad enough to account for

virtually every type of secondary debt transaction."  *Biondo*, 180 F.3d at 133.  With respect to

"extensions" of credit, the Fourth Circuit has concluded that:

> [a]n extension of credit is analogous to the classic forbearance granted by
> a creditor in relation to matured debt.  Extensions of credit under §
> 523(a)(2) are thus properly viewed as merely an agreed enlargement of the
> time allowed for payment.

*Id.* at 132; *see also In re Powelli*, 423 B.R. 201, 210 (Bankr. N.D. Tex. 2010) (A margin

agreement along with other agreements allowed defendant to continue drawing on a $6 million

dollar line of credit.); *Bank of America, N.A. v. Davis (In re Davis)*, 2002 Bankr. LEXIS 1953 at

---

[17] Imatek was so far behind in its payments to Covernet, a trade creditor, that Covernet required Imatek to give it a
subordinate security interest in its A/R, in violation of the loan documents.
[18] Even if the A/R Report submitted with the September 19 BBC did not overstate A/R, the fact that a substantial
amount of A/R was removed – for whatever reason from the AR report in 11 days – is further evidence that Jonathan
knew that the loan was substantially out of margin when he submitted the September 30 BBC.

*8-9 (Bankr. N.D.Tex. Apr. 30, 2002) (finding that a forbearance agreement alone was an "extension of credit" within the meaning of §523(a)(2)).

During this period, Jonathan's misrepresentations enabled Imatek to obtain additional funding under the Revolving Loan through the submission of the BBCs. He also induced the Bank to enter into the Forbearance Agreement, and caused the Bank to forbear from calling a default. Thus, as a result of his misrepresentations, Jonathan obtained "money, property, services, or an extension, renewal, or refinancing of credit." *See* §523(a)(2).

### b.   Materially False Statement and Intent to Deceive – The September 30  BBC

Jonathan offered a good deal of testimony about how the Fictitious Training Receivables found their way into the September 30 BBC, whether he noticed it, whether he first notified the Bank of the problem or vice versa, and the like. In the Court's view, however, the focus on these questions loses sight of the more pertinent inquiry. As EagleBank points out, the September 30 BBC had several potential misrepresentations. The first, which is not disputed, was that the total A/R and Eligible A/R were overstated by the amount of the Fictitious Training Receivables. The second, addressed in the previous section of this Memorandum, was that Imatek held the A/R shown on the BBC, even without including the Fictitious Training Receivables. The third, addressed here,  was that Jonathan certified that there was no default under the loan documents. Leaving aside the circumstances of how the Fictitious Training Receivables found their way onto the September 30 BBC, the Court concludes that Jonathan intentionally misrepresented that there was no default under the loan documents when he signed the September 30 BBC because he knew Imatek's A/R had been substantially overstated.

Jonathan was the President and 49% owner of Imatek. He was solely responsible for preparing and signing all BBCs and had intimate knowledge of the A/R position. Imatek was a

small corporation and serving as its President was Jonathan's livelihood.  Jonathan certainly

knew two crucial facts when he submitted the September 30 BBC: the approximate amount of

the actual, outstanding A/R and the outstanding Revolving Loan balance.  The actual A/R as of

the September 30 BBC was $414,646.26, and the Eligible A/R were $322,447.01.  *See* Ex. 30A

(Revised September 30 BBC).  The Court rejects any notion that, at the time he submitted the

September 30 BBC, Jonathan himself believed that A/R was twice what it actually was,

notwithstanding whatever the BBC stated.  So to, as the President, Jonathan certainly knew the

outstanding Revolving Loan balance exceeded $700,000.  Thus, Jonathan knew Imatek was

substantially out-of-margin on the Revolving Loan.  To put it otherwise, Jonathan himself was

not fooled by the Fictitious Training Receivables into believing that the Revolving Loan balance

was less than 80% of Eligible A/R.  When he signed the September 30 BBC certifying that there

was no default under the loan documents, he made a material, false representation.

Viewed in this light, Jonathan's explanations as to how the Fictitious Training

Receivables made their way onto the A/R Report that accompanied the September 30 BBC are

not especially pertinent (or believable).  Jonathan's misrepresentation was his certification that

there was no default under the loan documents.  That misrepresentation was made whether or not

he "accidently" misrepresented the amount of the Eligible A/R by including the Fictitious

Training Receivables.  Thus, even assuming that the September 30 BBC happened to be prepared

during a very short window when the accounting system was being tested, the Fictitious Training

Receivables do not provide a defense to the "no default" misrepresentation because Jonathan

knew that the actual and Eligible A/R were much less than the Revolving Loan balance.  He

knew Imatek was in default.

By the time the parties entered into the Forbearance Agreement, the Bank knew that Imatek was out-of-margin. But it understood Imatek was out-of-margin because of the inclusion of the Fictitious Training Receivables. It did not know Imatek was in default because of Jonathan's manipulations of the A/R. Jonathan made a material misrepresentation concerning Imatek's financial condition when he certified Imatek was not in default in the September 30 BBC.

Accordingly, for the foregoing reasons, the Court concludes that Jonathan's debt to the Bank is excepted from discharge under §523(a)(2)(B).

## B. EagleBank's §523(a)(6) Claims Against Jonathan and Harvey

EagleBank contends the Kormans willfully and maliciously diverted EagleBank's collateral with the intent to convert it for their personal use by wrongfully diverting the U.S. GPO Funds from the lockbox and using the funds for personal expenses. This Court agrees, and concludes that the Kormans are obligated to the Bank on a debt in the amount of the U.S. GPO Funds that is excepted from discharge under §523(a)(6).

Pursuant to §523(a)(6), an individual debtor is not entitled to discharge from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." According to the Fourth Circuit, the word "willful" and "malicious" create distinct requirements for a creditor seeking an order of dischargeability. *See First Nat'l Bank of Md. v. Stanley (In re Stanley)*, 66 F.3d 664, 667-668 (4th Cir. 1995).

The U.S. Supreme Court clarified that the word "willful" in §523(a)(6) means a deliberate or intentional injury. *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998). Subsequently, the Fourth Circuit has adopted the so-called "objective substantially certainty test" or "subjective motive" test. *Parsons v. Parks (In re Parks)*, 91 Fed.

Appx. 817, 819 (4th Cir. 2003)) (adopted the test in *In re Miller,* 156 F.3d 598, 603 (5th Cir. 1998)).  In sum, the test "is whether the debtor acted with 'substantial certainty [that] harm [would result] or a subjective motive to cause harm.'"  *In re Parks*, 91 Fed. Appx. at 819.  In a conversion scenario, the proper question to ask "is whether the debtor intended to improperly use the creditor's collateral and/or its proceeds for purposes other than the payment of the debt that property secured.  If so, there is an intentional injury."  *In re Wooten*, 423 B.R. 108, 133 (E.D.Va. 2010) (quoting *ABF, Inc. v. Russell (In re Russell)*, 262 B.R. 449, 454-55 (Bankr. N.D.Ind. 2001) (internal citation omitted)).

Malice means "an act causing injury without just cause or excuse . . . .  [A] plaintiff creditor can . . . establish malice on an implied basis from a showing of debtor's behavior, as well as a presentation of the surrounding circumstances."  *Johnson v. Davis*, 262 B.R. 663, 670-71 (Bankr.E.D.Va. 2001) (citing *St. Paul Fire & Marine Ins. Co.*, 779 F.2d 1003, 1010 (4th Cir. 1985); *Hagan v. McNallen*, 62 F.3d 619, 625 (4th Cir. 1995)).

The Kormans quickly and deliberately opened the PNC Account after they closed Imatek. Harvey sent to the U.S. GPO new bank information and instructions to not send any additional funds to the lock-box account.  Jonathan wrote the U.S. GPO and requested that all A/R payments be sent to the PNC Account rather than the lock-box.  They did so intending to harm the Bank by diverting its collateral and with the intent that the U.S. GPO Funds would not be available to pay the loan.  The Kormans acted maliciously; both Kormans testified about their anger toward the Bank for its refusal to continue to advance funds and for calling a default. Harvey's colorful language[19] established that they intended to get back at the Bank for its actions.  Jonathan admitted "we diverted the money because we couldn't get EagleBank to talk to us."  Trial Tr., 114, ll.19-20, May 4, 2011.

---

[19] *Supra.* n. 10.

The Kormans contend that they were justified in diverting U.S. GPO Funds because they believed the Bank violated the loan agreement by refusing to advance funds or failing to forbear on collection efforts.  But the Bank's action provided the Kormans with no defense.  In the February 12, 2009, letter, the Kormans' attorney told the Bank that Imatek was in dire financial condition.  In the February 20, 2009, letter, he told the Bank that Imatek was out of money and would close unless it obtained $300,000 of new equity within a week.  He further told the Bank that the Kormans would cooperate in turning over the collateral but only if the Bank agreed to a disposition of its collateral that included, among other terms, using $300,000 of the collateral proceeds to pay other non-Bank creditors and allowing Jonathan and his wife to retain their home.  Under these circumstances the Bank was fully justified in declaring a default and refusing to advance additional loan funds.  This determination is also supported by the Bank's expert's testimony on standard industry practices.[20]

As stated in the Findings of Fact, the great majority of the U.S. GPO Funds were used to pay the Kormans' personal expenses, primarily their personal workout attorney and Jonathan's criminal attorney.  They also withdrew over $9,800 in cash.  It is not altogether clear how all of these funds were spent, but the Bank never recovered the U.S. GPO Funds.

The Court therefore concludes that the Kormans willfully and maliciously intended to injure the Bank by diverting the U.S. GPO Funds to the PNC Account.  The question remains as to what is the amount of the debt that is excepted from discharge under §523(a)(6).  The Court previously addressed this question.  In resolving the parties' cross-motions for summary judgment, the Court ruled that, under the circumstances of this case, the amount of the "debt"

---

[20] The Kormans also contend their actions were justified because, at the last minute before the parties entered into Forbearance Agreement in December 2008, the Bank reduced the amount it would lend against Eligible A/R from 100% to 80%.  But the Kormans accepted that change, albeit begrudgingly, and it does not provide a basis for diversion of collateral three months later.

29

owed for purposes of §523(a)(6) would be the amount of the diverted collateral, not the entire amount of the obligation to the Bank. *See* Docket No. 63 at 72-78 (Bench Ruling Tr., Nov. 24, 2010). In an order issued subsequent to the bench ruling, the Court summarized its holding in the bench ruling on this issue as follows:

> As addressed more fully on the record at the hearing, the Court reaffirms its ruling that, in the event the Plaintiff establishes a claim under §§523(a)(4) or (a)(6) based on the factual allegations that one or both Defendants contacted account receivable obligors of Imatek of Maryland, Inc. and instructed them to send the account payments to the PNC bank account, the entire amount of the Plaintiff's $2.9 million debt would not be excepted from discharge. As stated during the Court's bench ruling on summary judgment on November 18, 2011 [sic, 2010], this holding is based essentially on (1) the language of §§523(a)(4) and (a)(6); (2) the holdings of *In re Ellison*, 296 F.3d 266 (4th Cir. 2002) and *In re Modicue*, 926 F.2d 452 (5th Cir. 1991); and (3) the undisputed facts, which establish that at the time the Defendants contacted the account obligors, the Plaintiff's loan to Imatek was fully funded, Imatek had ceased operations and the Plaintiff took no further action, provided no further credit extension and did not alter its risk position in any way.

Docket No. 71 at 2. Accordingly, the Court concludes that Jonathan and Harvey owe a debt to the Bank in the amount of $23,102 that is excepted from discharge under §523(a)(6).[21]

## C. Denial of Discharge under §727(a)

EagleBank seeks to deny Jonathan a discharge under §727 due to his diversion of and failure to account for the U.S. GPO Funds and his failure to maintain accurate books and records for Imatek, specifically the A/R Reports. This Court agrees.

Section 727(a)(7) provides that the court shall deny a discharge where:

> the debtor has committed any act specified in paragraph (2), (3), (4), (5) or (6) of this subsection, on or within one year before the date of the filing of the petition, or during the case, in connection with another case under this title or under the Bankruptcy Act, concerning an insider;

---

[21] The Bank also brings a claim under §523(a)(4) against the Kormans for the same diversion of the U.S. GPO Funds. Because the Court rules that the amount of the U.S. GPO Funds is excepted from discharge under §523(a)(6), it does not address the §523(a)(4) claim.

§727(a)(7).  EagleBank contends that Jonathan committed an act specified in §727(a)(2) by diverting the U.S. GPO Funds, and in §727(a)(3) by falsifying the A/R Reports.

### 1.  Denial of Discharge under §727(a)(2)

Section 727(a)(2) provides that the Court shall grant a debtor a discharge unless

> (2) . . . the debtor, with intent to hinder, delay or defraud a creditor . . .
> has transferred, removed, destroyed, mutilated, or concealed or has
> permitted to be transferred, removed, destroyed, mutilated, or concealed –
>     (A) property of the debtor, within one year before the date of the filing
>     of the petition; or
>     (B) property of the estate, after the date of the filing of the petition.

§727(a)(2).  As applicable here, to establish a claim under §727(a)(2) and (a)(7), the Bank must establish that Jonathan committed an act described by §727(a)(2) within one year before the filing of the petition in connection with the bankruptcy case of Imatek.

The purpose of §727(a)(2) is deny relief to those who "play fast and loose with their assets or with the reality of their affairs." *Farouki v. Emirates Bank Int'l Ltd.*, 14 F.3d 244, 249 (4th Cir. 1994) (quoting *In re Tully*, 818 F.2d 106, 110 (1st Cir. 1987)).  The creditor holds the burden of proof by preponderance of the evidence, and once a creditor makes a prima facie case, the burden of proof shifts to the debtor.  *Id.*  For a discharge to be denied under §727(a)(2): there must be  "(1) a disposition of property, such as transfer or concealment, and (2) a subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act of disposing of the property." *In re Lawson*, 122 F.3d 1237, 1240 (9th Cir. 1997) (citing *Rosen v. Bezner*, 996 F.2d 1527, 1531 (3d Cir. 1993)).  A debtor's intent need not be fraudulent to meet the requirements of §727(a)(2) because the statute is in the disjunctive and it is sufficient if the debtor's intent is to hinder or delay a creditor.  *Bernard v. Sheaffer (In re Bernard)*, 96 F.3d 1279, 1281 (9th Cir. 1996) (citing *Matter of Smiley*, 864 F.2d 562, 568 (7th Cir. 1989)).

The Court concluded above that Jonathan diverted the U.S. GPO Funds to injure the Bank, and here concludes that in doing so he acted to hinder and delay the Bank in the collection of its collateral.  Further, as concluded above, he failed to fully account for the U.S. GPO Funds and used them primarily for his own personal benefit.

Moreover, Jonathan concealed the U.S. GPO Funds from the Bank and concealed them in the Imatek case.  In Imatek's bankruptcy case, Jonathan completed the schedules of Imatek and did not identify any accounts at PNC Bank.  Jonathan completed the Statement of Financial Affairs for Imatek and did not identify the PNC Bank Account as a closed account.  Jonathan did not report the receipt and use of the proceeds of the U.S. GPO Funds on his Chapter 11 monthly operating reports for March 2009 or April 2009.  It was not until October 13, 2009, approximately eight months after their personal bankruptcy filings and the filing of the involuntary petition against Imatek, that the Kormans first informed the Bank that Imatek opened the PNC Account to receive the U.S. GPO Funds.

The evidence established that Jonathan's actions with respect to the U.S. GPO Funds meet the literal elements of §727(a)(2) and (a)(7).  Ordinarily, however, the Court would be hesitant to deny the discharge of such significant debts as those at issue here based on the relatively small amount of the U.S. GPO Funds, especially after concluding that the amount of the U.S. GPO Funds is excepted from discharge and therefore subject to recovery by the Bank. But the record established that Jonathan's actions in diverting the U.S. GPO Funds and failing to disclose the diversion or the PNC Account were consistent with his complete disregard for the rights of creditors.  As stated above, bankruptcy relief is available to "the honest but unfortunate debtor."  *Cohen*, 523 U.S. at 217.  By this standard, and the standards of §727(a)(2) and (a)(7), Jonathan is not entitled to a discharge.

### 2.  Denial of Discharge under §727(a)(3)

Section 727(a)(3) denies a debtor a discharge when:

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all the circumstances of the case.

§727(a)(3).  A party objecting to a bankruptcy discharge petition on this basis must make an initial showing that (1) the debtor failed to keep and preserve adequate financial records, and (2) such a failure does not allow creditors to ascertain the debtor's financial condition.  *See Meridian Bank v. Alten*, 958 F.2d 1226, 1232 (3d Cir. 1992).

In discussing §727(a)(3), the Fourth Circuit has held that the debtor is "obliged by the statute to preserve sufficient and adequate financial records to enable the court and the parties to reasonably ascertain an accurate picture of his financial affairs."  *Mercantile Peninsula Bank v. French (In re French)*, 499 F.3d 345, 355 (4th Cir. 2007); *see also In re Fader,* 414 B.R. 640, 645 (Bankr.N.D.Cal. 2009) ("While section 727(a)(3) does not require absolute completeness in the records, it does require a debtor to keep and preserve records that will enable his creditors to accurately ascertain his financial condition and business transactions."); *In re Schifano*, 378 F.3d 60, 69 (1st Cir. 2004) (failure to maintain a bank account by an individual involved in many transactions raises serious doubts about the debtor's financial status); *Meridian Bank*, 958 F.2d at 1230 ("The Bankruptcy Code does not require a debtor seeking a discharge specifically to maintain a bank account, nor does it require an impeccable system of bookkeeping.").  The Third Circuit also explained that "[t]he test is whether there [is] available written evidence made and preserved from which the present financial condition of the bankrupt, and his business transactions for a reasonable period in the past may be ascertained."  *Meridian Bank* at 1230

(quoting *In re Decker*, 595 F.2d 185, 187 (3d Cir. 1979)).  A trier of fact can also consider the debtor's sophistication, and debtor's timeliness of disclosure.  *See id.* at 1231; *French* at 356.

Here, although the Bank contends that Jonathan failed to keep books and records of Imatek, its real objection is that Jonathan failed to keep *accurate* books and records.  Section 727(a)(3) results in the denial of a discharge where a debtor "falsified" books and records, and that is what Jonathan did here.  The Court has concluded that Jonathan intentionally misrepresented the A/R information in the A/R Reports.  Given his manipulation of the information, it is impossible to ascertain the value of Imatek's A/R from at least August 2008 until it closed.  For that reason, the Court will deny his discharge.

Finally, Jonathan points out that, in entering into the Forbearance Agreement, he and Harvey pledged additional personal collateral to the Bank and had their spouses join the guaranty.  He contends this is evidence of his good faith and that he would never have done so if he was committing fraud.  But the only way Imatek could stay in business was to obtain additional funds from the Bank.  And that could occur only if Jonathan and Harvey agreed to the Bank's terms as set forth in the Forbearance Agreement.  His choice was simple: Imatek could close immediately or he could agree to terms acceptable to the Bank, which gave him a chance to turn the company around.  He chose the latter.  That choice does not negate his fraudulent intent.

Accordingly, denial of discharge is appropriate.

## CONCLUSION

The Court will enter an order consistent with this Memorandum of Decision.

cc:     All parties
        All counsel

## END OF MEMORANDUM