**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|  |  |
|---|---|
| **JONATHAN S. KORMAN,** | * |
| Appellant/Defendant, | * |
| v. | * Case No.: PWG-12-3449 |
| **EAGLEBANK,** | * |
| Appellee/Plaintiff. | * |

**MEMORANDUM OPINION**

Appellant Jonathan S. Korman has filed an appeal from two orders that the United States Bankruptcy Court for the District of Maryland entered. ECF Nos. 1 & 6. These orders are the September 26, 2012 Memorandum of Decision and Order Denying Discharge and Judgment of Nondischargeability, ECF Nos. 1-12 & 1-13, in which the bankruptcy court held that Appellant's debt to EagleBank was nondischargeable and that Appellant was not entitled to a bankruptcy discharge, and the January 23, 2013 Order Awarding Attorney's Fees and Entering Money Judgments Against Jonathan A. Korman and Harvey J. Korman, ECF No. 6-6. Having reviewed the parties' briefs (ECF Nos. 5, 7 & 10) and the record, I find oral argument unnecessary. *See* Fed. R. Bankr. P. 8012; Loc. R. 105.6. For the reasons that follow, the bankruptcy court's order denying Appellant a discharge under 11 U.S.C. § 727(a) and finding Appellant's debt to EagleBank to be nondischargeable under 11 U.S.C. § 523(a)(2)(B) will be AFFIRMED, and the order awarding attorney's fees against Appellant will be AFFIRMED.

**I.     FACTUAL AND PROCEDURAL BACKGROUND[1]**

Appellant and his father, Harvey Korman (collectively, "the Kormans"), co-owned Imatek, a Maryland corporation that printed and distributed media displays for companies in the United States, including the United States Government Printing Office ("U.S. GPO"). Bankr. Ct. Mem. 2. Appellee EagleBank lent funds through various loans to Imatek until February 27, 2009, when Imatek closed. *Id.* Appellant, his father, and their wives personally guaranteed Imatek's debt to EagleBank. *Id*. at 3 & 8.

EagleBank extended a revolving line of credit ("Revolving Loan") to Imatek, up to a total of $750,000 at any given time, secured by Imatek's accounts receivable ("A/R"). Bankr. Ct. Mem. 3–4. EagleBank relied on "borrowing base certificates" or "BBCs," accompanied by A/R reports, to advance funds under the Revolving Loan and to defer collection efforts, when appropriate. *Id.* Appellant prepared and submitted the BBCs and A/R reports to EagleBank to obtain advances, as well as monthly in accordance with EagleBank's requirements, certifying the amount of income in its eligible accounts receivable. *Id.* The eligible A/R included all A/R less than ninety days old, except that if more than 50% of a customer's A/R were more than ninety days old, none of that customer's receivable balance was eligible. *Id.* at 3. The advance could not exceed 80% of the eligible A/R. *Id.*

Appellant submitted to the Bank on September 30, 2008 a BBC and A/R report (collectively, "September 30 BBC") that included fictitious accounts. Bankr. Ct. Mem. 5. Due to the inclusion of the fictitious accounts, the September 30 BBC showed eligible A/R of $818,812.53, rather than $322,447.01, the actual amount of eligible A/R. Bankr. Ct. Mem. 5–6.

---

[1] Insofar as the parties do not contest the facts as presented in the bankruptcy court's Memorandum of Decision, this Court relies on those facts. Where the parties disagree about the facts, citations to the record are provided.

Because the balance of the loan to Imatek was $735,578.51 at that time, the loan appeared to be in-margin, i.e., the eligible A/R appeared to exceed the loan balance. *Id.* In reality, the loan was out-of-margin and the error resulted in a $385,000 over-extension of credit to Imatek. *Id*. at 6–7. Appellant testified that Imatek created the fictitious invoices and accounts for existing customers to test Imatek's new accounting system, and he unknowingly generated the September 30 BBC during the brief period before the fictitious accounts were deleted. Bankr. Ct. Mem. 5. According to Appellant's testimony, this was an inadvertent mistake, and he notified EagleBank as soon as he discovered it. Trial Tr. 174:12–23, 178:6–9, 180:8–19, May 3, 2011, ECF No. 1-4.

Thereafter, the parties entered into a Forbearance and Modification Agreement ("Forbearance Agreement") on December 3, 2008. Bankr. Ct. Mem. 7. In exchange for a personal guarantee on the entire debt, EagleBank agreed not to exercise its rights regarding Imatek's defaults on the loans, modified the payment terms on the loans, required that all A/R payments be sent to a lockbox account, and extended additional credit of $250,000 to Imatek. *Id*. at 8. Two months later, in February 2009, through Appellant and his father's personal counsel, Imatek informed EagleBank that it needed additional cash to stay in business. *Id.* Based on these communications, EagleBank issued a default notice to Imatek on February 25, 2009, identifying various defaults and the cure period for each. *Id.* at 9. Imatek went out of business on February 27, 2009, without curing the defaults. *Id.*

Harvey Korman opened a bank account at PNC Bank ("PNC Account") in early March, 2009. Bankr. Ct. Mem. 9. Although it is disputed whether Appellant opened the account with his father, *compare* Appellant's Br. 4 & 17 *with* Appellee's Br. 10, it is undisputed that, as of

3

March 27, 2009, the account was in both of their names.[2] Appellant's Br. 4; Appellee's Br. 10. By email, Appellant directed the U.S. GPO to submit payments on receivables to the PNC Account, and the U.S. GPO submitted payments of $23,102 ("U.S. GPO Funds") to that account, rather than the lockbox account. Bankr. Ct. Mem. 10; Trial Tr. 102:4–23, 120:10–14, May 4, 2011. The PNC Account did not appear on Imatek's bankruptcy schedules, Bankr. Ct. Mem. 11, and the Kormans did not disclose the account to EagleBank until October 2009, seven months after opening it, Trial Tr. 11:1–118:7, May 4, 2011 (Appellant's testimony).

On February 27, 2009, Appellant filed for relief under Chapter 11 of the Bankruptcy Code, and the bankruptcy court converted the case to a Chapter 7 case. Bankr. Ct. Mem. 2 & n.4; Bankr. Ct. Case No. 09-13353 (WIL) (*In re Jonathan & Michelle Korman*). As a creditor, EagleBank filed a proof of claim for $2,925,941.39. Bankr. Ct. Mem. 2–3. EagleBank also initiated an adversary proceeding against Appellant on June 5, 2009, alleging that Appellant's debt to EagleBank, including the U.S. GPO Funds, was not subject to discharge in bankruptcy pursuant to 11 U.S.C. § 523(a)(2) and § 727(a).[3] Bankr. Ct. Mem. 12; Bankr. Ct. Case No. Adv. Proc. 09-362, Docket Entry 1. The bankruptcy court concluded that the U.S. GPO Funds were excepted from discharge under 11 U.S.C. § 523(a)(6) and that Appellant's debt to EagleBank

---

[2] Although Appellant testified before the bankruptcy court that he "did not open the [PNC] account," Trial Tr. 104:22, May 4, 2011, he acknowledged that the bank file included an application that Appellant signed to open the account, *id.* at 105:16–18. Appellant testified that he signed the application at home and the bank "would not accept it," so he "had to personally go to the bank on March 27th . . . and do it in person." *Id.* at 18–25. Yet, the bank retained the application in the file, *see id.* at 105:16–18, which makes Appellant's explanation suspect. Moreover, Appellant testified that he attempted to open the account, *id.*, and he conceded that he "used [his] signature in order to acquire money from this account." *Id.* at 106:9–11. Further, he acquired a signature card less than a month after the account opened. *Id.* at 18–25. Thus, Appellant certainly acquiesced in, and likely participated in, opening and maintaining the PNC Account.

[3] EagleBank and two other creditors initiated an involuntary bankruptcy proceeding against Imatek on March 20, 2009, which ended on July 22, 2009, when the bankruptcy court granted relief against Imatek. Bankr. Ct. Mem. 2–3.

4

was excepted from discharge under 11 U.S.C. § 523(a)(2)(B), and the court denied Appellant a discharge under 11 U.S.C. § 727(a).  Bankr. Ct. Mem. 27, 30, 32, & 34.

## II.     STANDARD OF REVIEW

This Court has jurisdiction over appeals from the bankruptcy court.  28 U.S.C. § 158.  It is well established that this Court "reviews a bankruptcy court's findings of fact for clear error and conclusions of law de novo."  *Rosen v. Kore Holdings, Inc. (In re Rood)*, 448 B.R. 149, 157 (D. Md. 2011); *see In re Official Comm. of Unsecured for Dornier Aviation (N. Am.), Inc.*, 453 F.3d 225, 231 (4th Cir. 2006).  Also, this Court reviews the bankruptcy court's application of law to fact for abuse of discretion.  *Coggins & Harman, P.A. v. Rosen (In re Rood)*, No. DKC-12-1623, 2013 WL 55650, at *2 (D. Md. Jan. 2, 2013).  Notably, when intent is an element of the law that the bankruptcy court applies, "'[w]hether a particular debtor has satisfied [that element] is a question of fact. Because the average debtor will deny the fraudulent intent alleged by a party seeking denial of the debtor's discharge, a court may decide the issue upon circumstantial evidence or "inferences drawn from a course of conduct."'"  *Pumphrey v. Neese*, No. 10-cv-3215-AW, 2011 WL 1627163, at *2 (D. Md. Apr. 27, 2011) (quoting *Wachovia Bank, Nat'l Ass'n v. Voccia (In re Voccia)*, 477 B.R. 625, 632–33 (Bankr. E.D. Va. Feb. 1, 2011) (citation omitted)).  Additionally, "[d]eference to a bankruptcy court is particularly appropriate on findings of intent, 'because a determination concerning fraudulent intent depends largely upon an assessment of the credibility and demeanor of the debtor.'"  *Simone v. Donahoo*, No. GLR-12-1143, 2013 WL 360389, at *4–5 (D. Md. Jan. 29, 2013) (quoting *Boyuka v. White (In re White)*, 128 Fed. App'x 994, 999 (4th Cir. 2005)).  Likewise, deference "is particularly appropriate when, as here, the bankruptcy court presided over a bench trial in which witnesses testified and the court made credibility determinations."  *Unsecured Creditors for Dornier Aviation*, 453 F.3d

5

at 235.  "So long as the bankruptcy court's account of evidence is plausible, the district court may not reverse the decision simply because it would have weighed the evidence differently." *Simone*, 2013 WL 360389, at *2.  Thus, "[i]f there are 'two permissible views of evidence, the factfinder's choice between them cannot be clearly erroneous.'" *Id.* (quoting *McGahren v. First Citizens Bank & Trust Co. (In re Weiss)*, 111 F.3d 1159, 1166 (4th Cir. 1997)).

### III. DISCUSSION[4]

---

[4] Appellant presents thirteen issues for this Court to consider in his original appeal:

    1. Whether, in the absence of documentary evidence submitted in the record of invoices to customers of Imatek or other documentary evidence to prove the contents of these invoices, the Court properly disregarded the testimony of Jonathan Korman regarding the date the invoice was created, the amount of the invoice and the entity to whom the invoice was payable, and other aspects of the borrowing base certificates and summary thereof introduced at trial.

    2. Whether Jonathan Korman properly and timely notified Eagle Bank of the "fictitious training receivables," based on the record of the case, so as to support the finding that his debts were nondischargeable as found by the Court.

    3. Whether Eagle Bank was properly found not to have defaulted on the forbearance agreement, and whether any such default constitutes a defense.

    4. Whether the transfer of $23,102 in receivables to a bank account in violation of covenants in the forbearance agreement (A) constituted a material default and (B) is sufficient to sustain a judgment of nondischargeability of the debt to Eagle Bank and all of the Appellant's debts, as found by the Court.

    5. Whether Eagle Bank took reasonable steps to collect the accounts receivable of Imatek after taking over the business.

    6. Whether the evidence is sufficient to sustain the finding that Appellant falsified and manipulated accounts receivable on reports submitted to Eagle Bank, and, if so, whether such falsification was intentional or material so as to sustain a judgment of nondischargeability.

    7. Whether the expert witness testimony elicited in Eagle Bank's case is sufficiently probative and competent.

    8. Whether the evidence at trial was sufficient to establish that Appellant improperly disposed of collateral of Eagle Bank with the intent of hindering, delaying or defrauding Eagle Bank, and whether the trial court applied the proper standard to the evidence on this issue.

> 9. Whether the trial court applied the proper standard to the retention of financial records of Imatek which accurately stated the financial position of Imatek as a defense to the trial court's findings.
>
> 10. Whether Appellant was entitled to rely on advice of legal counsel in its dealings with Eagle Bank, and whether this reliance is an adequate defense.
>
> 11. Whether Eagle Bank knew or should have known of the alleged inaccuracies in any of the financial data submitted by Appellant, and whether this knowledge constitutes a defense.
>
> 12. Whether Eagle Bank knew or should have known that Imatek was in default of its financial and other obligations, and whether this knowledge constitutes a defense.
>
> 13. Whether any of the bases set forth as grounds for denial of discharge of the Appellant were undertaken by the Appellant with the intent to deceive Eagle Bank, or fraudulently or otherwise improperly.

Appellant's Statement of Record & Issues on Appeal 2–4, ECF No. 1-1.  Appellant presents his argument in his brief without reference to these issues, instead structuring his argument around an analysis of the bankruptcy court's holdings with regard to § 523(a)(2)(B) and § 727(a). Appellant does not discuss the bankruptcy court's § 523(a)(6) holding on appeal.  This Court will focus on the issues as discussed in Appellant's brief. *See Jessco v. Builders Mut. Ins. Co.*, 472 Fed. App'x 225, 230–31 (4th Cir. 2012) (stating that "[i]n the statement of the issues on appeal included in its brief, [appellant] lists ten issues," but "[i]n the body of its brief, . . . [appellant] substantively addresses only three issues," such that appellant "abandoned any challenge" to the other issues by "failing to substantively address [them] in brief"); *In re Lambert Oil Co.*, 298 Fed. App'x 264, 268 n.5 (4th Cir. 2008) (stating that appellant waived issues for which it "failed to supply any legal argument supporting its position"); *see also Tasker v. Maryland*, No. 13-6219, 2013 WL 1340103, at *1 (4th Cir. Apr. 4, 2013) (stating that the appellate court would "confine [its] review on appeal to the issues raised in [appellant's] informal brief" and not extend it to review of issues listed in district court's "certificate of appealability"); *United States v. Al-Hamdi*, 356 F.3d 564, 571 n.8 (4th Cir. 2004) ("It is a well settled rule that contentions not raised in the argument section of the opening brief are abandoned."); *EQT Gathering Equity, LLC v. Fountain Place, LLC*, No. 12-1730, 2013 WL 2177321, at *7 n.6 (4th Cir. May 21, 2013) (quoting *Al-Hamdi*).

Appellant filed an Amended Appeal on January 31, 2013, ECF No. 6, presenting two additional issues:

> 14. Whether, if the underlying dischargeability judgments are reversed or modified, the award of attorneys' fees and administrative expenses is proper, or whether in that instance this award should be modified.
>
> 15. Whether the amount of attorneys' fees awarded against Jonathan Korman is proper.

Appellant's Statement of Record & Issues on Am. Appeal 2, ECF No. 6-5.  This Court's disposal of the other issues Appellant raises renders Issue 14 moot.  Moreover, Appellant does not brief these issues, and the time for doing so has passed.  *See* Fed. R. Bankr. P. 8009(a)(1).  Therefore,

7

A creditor may petition the bankruptcy court to prevent the discharge of debt under either § 523(a) or § 727(a) of the Bankruptcy Code. *See* 11 U.S.C. §§ 523(a), 727(a), 727(c)(1). However, § 523(a) "sets forth a variety of grounds upon which *a claim of a particular creditor* against the debtor may be held to be non-dischargeable," while § 727(a) "sets forth grounds upon which the debtor's discharge may be denied for reasons relating to conduct of the debtor affecting *all creditors*." *In re Hass (Hass v. Hass)*, 273 B.R. 45, 49 (S.D.N.Y. 2002) (emphasis added). Consequently, "[a] judgment of non-dischargeability under Section 523(a) benefits only the debt owed to the particular creditor who objected to dischargeability and has no impact on claims of other creditors," whereas "[s]uccessful prosecution of a claim under Section 727(a) results in a judgment denying the debtor's right to a discharge as to all of his pre-petition creditors." *Id.* Because "[t]he grounds for challenging dischargeability under Section 523(a) and discharge under Section 727(a) are quite different," a court may find a debt to be nondischargeable under § 523(a) at the same time that the court permits discharge under § 727(a), or vice versa. *Id.* at 49–50.

**A. Nondischargeability under 11 U.S.C. § 523(a)(2)(B)**

The bankruptcy court concluded that Appellant's debt to EagleBank was nondischargeable under 11 U.S.C. § 523(a)(2)(B). Bankr. Ct. Mem. 27. Section 523(a)(2)(B) provides:

> A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--
>
>     . . .

---

this Court will not address Issue 15. *See Riffin v. Balt. Cnty., Md. (In re Riffin)*, No. 12-2422, 2013 WL 1926399, at *1 (4th Cir. May 10, 2013) (affirming dismissal of appeal where appellant "fail[ed] to timely file an appellate brief").

8

>  (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--
>
>  . . .
>
>  (B) use of a statement in writing--
>
>  (i) that is materially false;
>
>  (ii) respecting the debtor's or an insider's financial condition;
>
>  (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>
>  (iv) that the debtor caused to be made or published with intent to deceive.

This statute codifies the policy "of affording relief only to an honest but unfortunate debtor." *Cohen v. de la Cruz*, 523 U.S. 213, 217 (1998) (citation and quotation marks omitted). The elements of § 523(a)(2)(B) are "(1) the [debtor] made a written statement; (2) the written statement was about [the debtor's] financial condition; (3) the statement was materially false; (4) the [debtor] published the statement with the intent to deceive the plaintiff; and (5) the plaintiff reasonably relied on the false statement." *Guaranty Residential Lending, Inc. v. Koep (In re Koep)*, 334 B.R. 364, 372–73 (Bankr. D. Md. 2005). A creditor must prove these elements by a preponderance of the evidence to prevail. *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

The bankruptcy court noted that the parties stipulated that the BBCs and A/R reports were written statements with respect to "an insider's [Imatek's] financial condition"[5] and that EagleBank reasonably relied on the statements, such that "[t]heir dispute is over whether the BBCs were materially false and whether Jonathan [Korman] submitted them with intent to deceive." Bankr. Ct. Mem. 16. The bankruptcy court concluded that "Jonathan [Korman] intentionally falsified BBCs and A/R Reports in order to induce the bank to advance funds under

---

[5] "The term 'insider' includes[,] if the debtor is an individual[,] [a] corporation of which the debtor is a director, officer, or person in control." 11 U.S.C. § 101(30)(A)(iv). Appellant, the debtor in this case, is the co-owner of Imatek, a corporation, Bankr. Ct. Mem. 2, such that Imatek is an insider. *See* 11 U.S.C. § 101(30)(A)(iv).

9

the Revolving Loan" and that "the amount of the inaccuracies was material." Bankr. Ct. Mem. 22.

On appeal, Appellant argues that, in reaching its conclusion that Appellant's debt was nondischargeable, the bankruptcy court erroneously found that the BBCs were materially false and made with the intent to deceive. Appellant's Br. 10. Appellant insists that, if the bankruptcy court had credited his trial testimony, it would have found that the BBCs were not materially false.[6] *Id.* Also, Appellant contends that the bankruptcy court's conclusion that he intended to deceive EagleBank was erroneous because it was "based on [the court's] own analysis of the 9/18/08 and 9/30/08 BBCs . . . without any analysis of any supporting documents, as none were in evidence," and because all of the receivables "generated after September 2008 . . . were personally guaranteed" by Appellant, his father, and their spouses, and "used exclusively for corporate purposes." *Id.* at 10–11. In his view, "there is certainly no basis to assert that any such accounts were presented to the Bank with any kind of improper intent." *Id.* at 11. Appellant describes his own testimony at trial, curiously without citing to the record, to support his contention that his misrepresentations were not intentional, but rather "an inadvertent mistake." *Id.* at 11–12. In Appellant's view, the bankruptcy court should not have relied on the testimony of Imatek's customers, who "had a bias against Imatek" and could not "testify reliably about the status of the placement of the order, its timing, any changes," because the witnesses were not "the individual who was directly responsible for placing the order." *Id*. at 26. Nor, according to

---

[6] Appellant makes much of the fact that, in the Forbearance Agreement, "the Bank agreed to waive its rights" regarding the errors in the original September 30, 2008 BBC. Appellant's Br. 10. The bankruptcy court's conclusion that the reports were materially false is supported by errors in other BBCs and A/R reports, independent of the errors in the original September 30, 2008 BBC. *See* Bankr. Ct. Mem. 17–20 and discussion *infra* pages 12–13.

10

Appellant, should the bankruptcy court have relied on the testimony of EagleBank's expert, who "failed to address the explanations for Imatek's presentation of receivables." *Id.* at 25.

Essentially, Appellant's argument boils down to an assertion that his own testimony showed that the BBCs and A/R reports were neither materially false nor made with the intent to deceive, and that the bankruptcy court should not have disregarded his testimony in favor of other witnesses' testimony, which was unreliable. Appellant's Br. 10–14; *see* Appellee's Br. 16 ("Jonathan has not claimed in the appeal that EagleBank failed to introduce evidence that would satisfy each of the elements of its cause of action. Rather, Jonathan has appealed on the basis that the Court erred in not believing Jonathan's explanations to refute the elements of the claim that EagleBank had proven."). As noted, this Court affords the bankruptcy court great deference with regard to its assessment of the credibility of witnesses who have testified before the bankruptcy court. *Unsecured Creditors for Dornier Aviation*, 453 F.3d at 235; *Simone*, 2013 WL 360389, at *4–5. The bankruptcy court may believe one or more witnesses' testimony over another witness or witnesses' testimony. *See Marinucci v. SG Homes Assocs., LP*, 472 B.R. 299, 312 (D. Md. 2012) (noting that "[t]he bankruptcy court was free to give more weight" to the parties' stipulation, one witness's testimony, and a spreadsheet offered into evidence than to another witness's opposing testimony). Indeed, "[i]t is within the complete providence of the trier of fact to judge the credibility and accuracy of witness testimony and to weigh such testimony accordingly." *Wolff v. Rodgers Consulting, Inc.*, No. AW-12-cv-500, 2012 WL 1883766, at *3 (D. Md. May 21, 2012). Thus, the trial court relies not on the evidence presented in the greatest quantity, but rather the evidence, including testimony, that appears most accurate, reliable, and trustworthy. *See id.*; *Marinucci*, 472 B.R. at 312.

Simply put, the bankruptcy court did not believe Appellant's testimony, and it said as much: "He was not credible and his explanations [of inconsistencies and apparent manipulations in the A/R Reports] were not believable." Bankr. Ct. Mem. 21; *see id.* at 26 ("Jonathan's explanations as to how the Fictitious Training Receivables made their way onto the A/R Report that accompanied the September 30 BBC are not especially pertinent (or believable)."). The bankruptcy court explained clearly and in detail why it did not find Appellant to be credible. For example, the court noted that Appellant testified that "he used the order date to list a receivable rather than the invoice or shipping date" and that "he had always done this." *Id*. at 21. The court did not discount this testimony simply because Appellant's approach did not comport with the industry standard. Instead, the court found Appellant's testimony incredible because "Jonathan was not consistent in his use of the order date," as he "would initially use the order date and then change the age of the receivable when the invoice was set," such that he could "include the same order on the A/R Report long past ninety days," thereby inflating the amount of eligible A/R. *Id*. The court observed that Appellant did not provide any "rational explanation for the movement of receivables between the aging categories," relying only on "unsupported statements." *Id*. In addition, the court did not find Appellant credible because, after insisting that he had no additional invoices to produce in discovery to explain the inconsistencies in the A/R Reports, "[o]n the eve of his testimony, he produced several purported invoices that supported his testimony." *Id*. This Court defers to the bankruptcy court's assessment of Appellant's credibility, as that court "presided over a bench trial in which [Appellant] testified." *See Unsecured Creditors for Dornier Aviation*, 453 F.3d at 235. And, regardless of the deference due to the bankruptcy court in its assessment of a witness's believability, I agree that the record amply demonstrates that Appellant was not credible.

12

Rather than putting any credence in Appellant's testimony, the bankruptcy court relied on the documentary evidence, including "fifteen pages of questionable, inconsistent listings for the A/R," and the testimony of EagleBank's expert and the owners of two of Imatek's customers, all of which the court found credible. *Id.* at 17–18. This Court defers to the bankruptcy court's assessment of these witnesses' credibility, *see Unsecured Creditors for Dornier Aviation*, 453 F.3d at 235, and the greater weight that the bankruptcy court gave to these witnesses' testimony compared to Appellant's testimony. *See Marinucci*, 472 B.R. at 312; *Wolff*, 2012 WL 1883766, at *3. The bank's expert stated that, by changing invoice dates, Imatek listed invoiced amounts as eligible A/R for longer than ninety days, and in that manner, left certain invoices on the A/R reports for 171, 232, and even 264 days. Bankr. Ct. Mem. 17–18. The court cited other examples of invoices that inaccurately appeared as eligible A/R or appeared as current when they were past due. *Id*. at 18–20. Giving due deference to the bankruptcy court's determinations of credibility and intent, from this evidence and the fact that Appellant could not provide a credible explanation for the manipulations, it was not clearly erroneous for the bankruptcy court to conclude that Appellant was manipulating the A/R reports intentionally to deceive EagleBank into lending Imatek a greater amount of money. *See Simone*, 2013 WL 360389, at *4–5; *Pumphrey*, 2011 WL 1627163, at *2.

The bankruptcy court also properly concluded, based on this evidence, that these misrepresentations were material. It reasoned that "[t]he manipulations so permeated the A/R Reports that the . . . the reports do not reflect an accurate view of Imatek's true A/R position." *Id*. at 22. Further, one report alone, dated September 19, 2008, showed A/R of $965,148.58, more than half a million dollars more than the $414,646.26 in A/R that Appellant reported on the revised September 30, 2008 report, which both parties accept as accurate. *Id.* Appellant does

13

not allege that the September 19 figures were inflated accidentally by fictitious invoices, and there is no basis for believing that Imatek brought in more than $500,000 in less than two weeks at a time in which Appellant said that Imatek had a "'serious cash flow problem.'" *Id*. at 22–23; *see* Trial Tr. 175:7–9, May 3, 2011 (Appellant's testimony that there could not have been a "difference of like $200,00" between September 30, 2009 and October 2009 "because [Appellant] was somewhat aware that [Imatek was] having a receivable problem"). Thus, the court's finding that the misrepresentations were material is not clearly erroneous. Therefore, the bankruptcy court's conclusion that Appellant's debt to EagleBank was nondischargeable under § 523(a)(2)(B), because he intentionally falsified BBCs and A/R reports to induce the bank to advance funds under the Revolving Loan, is AFFIRMED.[7]

### B.  Denial of Discharge under 11 U.S.C. § 727(a)

The bankruptcy court also denied Appellant a discharge under 11 U.S.C. § 727(a). In pertinent part, § 727(a)(7) provides that the court shall not grant the debtor a discharge if "the debtor has committed any act specified in [§ 727(a)(2) or (3)], on or within one year before the date of the filing of the petition, or during the case, in connection with another case, under this title or under the Bankruptcy Act, concerning an insider." It is undisputed that Imatek is an "insider" and the BBCs and A/R reports pertained to Imatek's financial condition. *See* Bankr.

---

[7] The bankruptcy court also concluded that "Jonathan intentionally falsified BBCs and A/R Reports in order to induce the Bank to . . . enter into the Forbearance Agreement and refrain from taking remedial action." Bankr. Ct. Mem. 22. In addition, the court concluded that "[l]eaving aside the circumstances of how the Fictitious Training Receivables found their way onto the September 30 BBC, . . . Jonathan intentionally misrepresented that there was no default under the loan documents when he signed the September 30 BBC because he knew Imatek's A/R had been substantially overstated," and that misrepresentation was material. *Id.* at 25 –26. This Court need not review these findings because the bankruptcy court was not clearly erroneous in finding ample evidence of Appellant's intentional, material misrepresentations on various BBCs to secure advances under the Revolving Loan, and this provided an adequate basis for the bankruptcy court's conclusion that Appellant's debt was nondischargeable under § 523(a)(2)(B).

14

Ct. Mem. 16. Additionally, the U.S. GPO Funds were Imatek's receivables. *Id.* at 10; *see* Trial Tr. 28:8–13, May 5, 2011 (Appellant's testimony).

> Section 727(a)(3) provides that the court shall not grant the debtor a discharge if
>
> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

For a bankruptcy court to deny discharge pursuant to § 727(a)(3), a creditor must show "that a debtor's records are insufficient to ascertain the debtor's financial condition and business transactions." *Trustee v. Sieber (In re Sieber)*, 489 B.R. 531, 550 (Bankr. D. Md. 2013). Once the creditor makes that showing, "'the burden of production shifts to the debtor to produce additional credible evidence to rebut the proof of insufficient records, or to justify the absence of records.'" *Id.* (citation omitted).

The bankruptcy court found that Appellant "intentionally misrepresented the A/R information in the A/R Reports." Bankr. Ct. Mem. 34. Appellant argues that the bankruptcy court erred in finding that he "failed to keep accurate books and records" because, although he "was not able to provide copies of invoices and other records," there was evidence "that the invoices and other books and records were taken by Ms. Lichtenstein, a representative of the Bank, during her visit to the Imatek facilities and therefore were available to the Bank and its personnel." Appellant's Br. 17. Regrettably, Appellant does not cite where this evidence appears in the record. In any event, Appellant's argument is irrelevant, as the bankruptcy court based its finding on the inaccuracies in the reports, rather than a failure to keep or produce the records. *See* Bankr. Ct. Mem. 34 ("[A]lthough the Bank contends that Jonathan failed to keep books and records of Imatek, its real objection is that Jonathan failed to keep *accurate* books and records."). Moreover, as discussed *supra* in Part II.A, this finding was not clearly erroneous.

15

Additionally, as discussed *supra* in Part II.A, the bankruptcy court's finding that "the reports do not reflect an accurate view of Imatek's true A/R position," Bankr. Ct. Mem. 22, also is not clearly erroneous. From the evidence EagleBank presented at trial, which the bankruptcy court found trustworthy, the bankruptcy court properly concluded that "it is impossible to ascertain the value of Imatek's A/R from at least August 2008 until it closed." Bankr. Ct. Mem. 34; *see In re Sieber*, 489 B.R. at 550. Moreover, Appellant failed to produce credible evidence that Imatek's records were accurate enough for EagleBank to ascertain Imatek's financial status or to justify the misrepresentations in Imatek's records. *See In re Sieber*, 489 B.R. at 550. Therefore, the bankruptcy court properly denied Appellant a discharge under § 727(a)(7), based on Appellant committing an act specified in § 727(a)(3).[8] *See Simone*, 2013 WL 360389, at *2; *In re Rood*, 448 B.R. at 157. Accordingly, the bankruptcy court's order denying discharge under § 727(a) will be AFFIRMED.

## IV. CONCLUSION

In sum, the bankruptcy court's order finding that Appellant's debt to EagleBank was nondischargeable under § 523(a)(2)(B) and denying Appellant a discharge under § 727(a) will be AFFIRMED, and the bankruptcy court's order awarding attorney's fees against Appellant will be AFFIRMED as well. Having entered this Memorandum Opinion and the accompanying Order, the Clerk shall CLOSE this case.

---

[8] The bankruptcy court also denied Appellant a discharge under § 727(a)(7) on the basis that he committed an act specified in § 727(a)(2) when he "diverted the U.S. GPO Funds to injure the Bank, . . . failed to fully account for the U.S. GPO Funds and used them primarily for his own personal benefit." Bankr. Ct. Mem. 32. However, "[b]ecause the [creditor] need[ed] only prove one of the grounds set forth in section 727(a), the Court need not base its decision [to affirm the bankruptcy court's order denying discharge under § 727(a)] on the other subsections of 727 litigated by the parties at trial." *In re Sieber*, 489 B.R. at 558.

A separate Order follows.

Dated: July 22, 2013 </u>                                             /S/
                                                    Paul W. Grimm
                                                    United States District Judge

lyb